OPINION
By the Court,
Springer, J.:
Attorney Brady Williams Keresey seeks a writ of prohibition prohibiting the State Bar of Nevada from proceeding against him on a complaint filed by the Bar on August 17, 1992, arising out of conduct alleged to have been committed in the summer of 1990.
In May of 1990 Mr. Keresey and his client, Ms. Katrina Kimura-Eckert, signed a document called “Agreement of Retainer and Professional Engagement.” In that document Ms. Eckert was designated as “Client” and Mr. Keresey was designated as “Attorney.” The document provided that Mr. Keresey was to “represent her in various matters.” Mr. Keresey, on his part, agreed that he would act as Ms. Eckert’s attorney and, specifically, that “under no circumstances at any time now, or in the future, will Attorney disclose to anyone, in or out of court, any information whatsoever of and concerning Client without Client’s express written permission.” This is the essence of the professional engagement agreement signed by Mr. Keresey and his client.
Mr. Keresey acted as Ms. Eckert’s attorney during her divorce case, in association with attorneys Ron Logar and Samuel Belford, at an agreed-upon hourly rate of $85.00 per hour. Despite the fact that Ms. Eckert filed a sworn affidavit in support of a motion for allowances in which she requested that her husband pay to Mr. Keresey for his legal services an interim attorney’s fee of $13,566.00, she later claimed, under oath, that Mr. Keresey “was never her lawyer.”
Claiming that the professional engagement document was a “sham” and that Mr. Keresey filed an attorney’s lien even though he was “never her lawyer,” Ms. Eckert brought these improbable claims to Bar officials. Although Ms. Eckert’s actual complaints are not part of this record, her complaints eventually became part *1141 of a formal Bar complaint which was filed by Bar counsel on August 17, 1992, about two years after the complaints were originally made. This is the only disciplinary charge that has ever been made against Mr. Keresey. A copy of the charging allegations of the August 1992 complaint are included in the margin.[1]
The first of Ms. Eckert’s formal charges against Mr. Keresey is that the professional engagement document was a “sham” and was signed by the parties to protect Ms. Eckert so that Mr. Keresey “could not be questioned in her pending divorce proceedings about their [allegedly romantic] relationship.” Quite obviously, the document would not protect Ms. Eckert from Mr. Keresey’s being “questioned” in her divorce case. Bar counsel mentioned to the Disciplinary Board that he did not “know how that agreement would have done that”; and one Board member chimed in with “That makes no sense.” The charge that the agreement was a “sham” designed only for the purpose of protecting Ms. Eckert and not for its stated purposes, did not, of course, make any sense; and Bar counsel appropriately advised the Disciplinary Board that he “would not be in a position to prove by clear and convincing evidence that the agreement . . . was in fact a sham agreement.[2]
*1142 The Bar is now pursuing charges that Mr. Keresey signed a “sham” professional engagement agreement; and the only two charges contained in the August 17, 1992 complaint which the Bar now intends to pursue are: (1) that Mr. Keresey’s “romantic involvement with Ms. Eckert violated his duties to his client,” (2) that he was not, in fact, Ms. Eckert’s attorney and that, accordingly, he filed an attorney’s lien “for [legal] work not performed.” The Bar tells us in its opposition document that there are only two matters “remaining in dispute,” namely:
(1) whether Keresey engaged in a sexual relationship with Ms. Eckert; and
(2) whether he did in fact act as her attorney and, if so, to what extent ....
The question before us, then, is whether the Bar should be prohibited, under the circumstances of this case, from trying to prove at this time (in the absence of Ms. Eckert) that Mr. Keresey engaged in a sexual relationship with Ms. Eckert in 1990 and from trying to establish “whether he did in fact act as her attorney, and if so, to what extent.” Because of the long and intolerable delays (over six years since the alleged commission of the complained-of professional misconduct) and because of the due process implications inherent in such delay, we conclude that the Bar should be prohibited from “going forward” in the manner announced in their opposition document.
The two most salient reasons for putting a stop to this prosecution are (1) that two different Bar counsel have recommended to the Board that the complaint be dismissed and (2) that the Discipline Board itself admitted that the Bar has “dropped the ball” in his case and is responsible for the delay.
Two different Bar counsel have tried to dismiss the August 17, 1992 complaint. By the time of the first hearing (March 2, 1994), almost four years after the complained-of events, Bar counsel had become convinced that he could not prove a case against Mr. Keresey. Mr. Keresey has, during the course of these proceedings, incurred close to $40,000.00 in attorney’s fees and suffered other destructive consequences.[3] Because of this he was appar *1143 ently willing to accept a private letter of reprimand in exchange for dismissal of the complaint, even though he has vehemently insisted throughout these proceedings that he was not guilty of any professional misconduct.
Bar counsel was very candid at the March 2, 1994 hearing and told the Board that he could not prove that the agreement was a sham and that he would “have a great amount of difficulty in proving by clear and convincing evidence that Mr. Keresey engaged in a sexual relationship with Ms. Eckert.” Bar counsel represented further that with regard “to the allegations concerning having sex . . . with a client, we don’t have a specific rule on that in Nevada.” With reference to Ms. Eckert’s sworn statement that Mr. Keresey “never was her lawyer,” Bar counsel stated that there was “no question that Mr. Keresey performed some legal services for Miss Katrina Eckert in the course of her divorce.” Bar counsel represented to the Board that Mr. Keresey was then willing to accept a private letter of reprimand relating to the manner in which he had drafted the professional engagement agreement and recommended that the complaint be dismissed.[4] The Board refused to accept this recommendation, and the complaint remained pending.
The matter lay dormant for almost one and one-half years, until August 3, 1995. By this time another Bar counsel had taken over the case. New Bar counsel conscientiously poured over page after page of documents in this file and argued to a newly- *1144 constituted Disciplinary Board the same argument that his predecessor had made — that the complaint should be dismissed. At the time of the second, August 1995 hearing Mr. Keresey had expressed his refusal to accept voluntarily any professional discipline, even a private letter of reprimand. Bar counsel moved that the “panel consider dismissal of this matter based upon a number of factors I’m going to outline here today.” Bar counsel told the Board that, “in fairness, I’ve looked very closely at her inconsistent statements . . . and I question her credibility, I really do.” On top of this, Bar counsel advised that he had not been successful in contacting Ms. Eckert and that she had apparently abandoned her complaint. Bar counsel advised the Board that the “State Bar does not intend to call any witnesses” and submitted the matter. Again, the Disciplinary Board refused to accept Bar counsel’s motion for dismissal.
At the Disciplinary Board’s direction, Bar counsel then hired a private investigator to search the land for Ms. Eckert. The investigator was eventually successful in locating Ms. Eckert, who told the investigator and Bar counsel that she would be willing to appear for a hearing. A hearing was set for October 5, 1995, but, as the Bar’s opposition document tells us, Ms. Eckert “failed to show up on October 5, 1995 or to otherwise contact the State Bar.” Nonetheless, the Disciplinary Board still wants to proceed, without Ms. Eckert, in an attempt to prove that “Keresey engaged in a sexual relationship with Ms. Eckert” in 1990. Now Bar counsel is faced, despite his conviction that the complaint should be dismissed, with the duty of trying to prove, without any witness, that Mr. Keresey was sexually involved with a client in 1990.[5]
In addition to rejecting the recommendations of two different *1145 Bar counsel, the two disciplinary panels involved in this case appear to be ignoring their own appraisal of the cause of the delays in this case. Even as far back as the March 2, 1994 hearing, two and one-half years ago, the Bar was aware of the delay problem. During the March 1994 hearing Board Chairman Digestí was critical of the time that this complaint had been “languishing,” noting that “we do not think that the Bar office did an adequate job” in prosecuting this case (which Bar counsel believed to be unprovable). Mr. Digestí went on further to say: “[U]nfortunately, I think this sort of fell through the cracks, the ball was dropped.”
If we were more convinced of the legitimacy of the complaint filed against Mr. Keresey, we might be more tolerant of the Bar’s having let it fall through the cracks in 1994. It does appear, however, that two successive Bar counsel were correct in their appraisal of the complaint and that there is really nothing to the complaint. The Bar now tells us that it still wants to pursue the matter of a supposed 1990 “sexual relationship” with a client. Paradoxically, even though her statement is incredible on its face, complainant Eckert has maintained throughout that she was never a client of Mr. Keresey. No one seems to have noticed that Ms. Eckert took advantage of her “vulnerable” status as a client when she is claiming at the same time that she was not Mr. Keresey’s client.
This case has gone on long enough. Mr. Keresey has sworn that he did not have sex with his client. His client claims that she was not his client. Now the Bar, according to its opposition document, “is prepared to go forward” and to present evidence on the issue of “whether he did in fact act as her attorney,” but that (as charged in the complaint) “if he were her attorney, [a 1990] romantic involvement with Ms. Eckert violated his duties to his client.” (Emphasis supplied.) It is nightmarish. The Bar may not “go forward” on the prosecution of a six-year-old case that appears never to have been a case.
The parties have presented a number of legal arguments relating to violations of time limits set by Supreme Court rules relating to professional discipline cases and arguments relating to estoppel and due process violations brought about by Mr. Keresey’s inability to defend against these six-year-old charges. We do not find it necessary to deal with these legal arguments in this case. It is absolutely clear to this court that fundamental fairness and common sense mandate the termination of these prolonged and agonizing proceedings against Mr. Keresey.
The writ of prohibition will issue; and the Bar is ordered to dismiss all proceedings against Mr. Keresey.
Steffen, C. J., concurs. Young, Shearing, and Rose, JJ., concur in result only.

The allegations made in the August 1992 complaint are as follows:

COUNT I.

That Respondent on or about April 20, 1990 met Katrina Kimura-Eckert. That thereafter Respondent and Ms. Eckert had an ongoing romantic and sexual relationship. As a direct result, Respondent prepared and signed a fraudulent and sham Retainer agreement dated May 14, 1990 (Exhibit “1”) so that he could not be questioned in her pending divorce proceedings about their relationship. That said Retainer Agreement was later filed in court and/ or presented as evidence in support of an attorney lien filed by Respondent against Ms. Eckert. That Respondent filed the attorney lien for work not performed and/or performed at excessive rates. That Respondent denied his relationship with Ms. Eckert to the court and in response to Complainant State Bar’s investigation. That if Respondent did act as Ms. Eckert’s attorney, he did not prepare a proper Retainer Agreement. That if he were her attorney, his romantic involvement with Ms. Eckert violated his duties to his client, created a conflict of interest, and took advantage of his client’s emotional vulnerability at that point. That Respondent submitted his bill and filed his attorney lien only after his affair with Ms. Eckert ended.

The complaint also contains a charge that Mr. Keresey did not “prepare a proper retainer agreement.” It is not at all clear just what was meant by this charge. The Bar’s opposition to the petition refers to SCR 155(2), which reads: “When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.” Although the hourly rate does not appear in the professional engagement agreement, it is clear that Mr. Keresey did communicate the $85.00 per hour rate to Ms. Eckert and that she agreed to this. The rule states that communi *1142 cation of the rate of fee is to be “preferably” in writing. The agreement was plainly devised for the purpose of protecting Ms. Eckert from embarrassing disclosures; and the agreement itself cited the kinds of sensitive information that Ms. Eckert wanted to be kept confidential, for example, assaults by her husband and her husband’s threats to kill her and to hire third persons to “commit sexual mayhem and torture her.” We can see no violation of SCR 155(2) arising out of the May 1990 professional engagement agreement.

The Bar’s opposition document does not deny any of the factual allegations incorporated into Mr. Keresey’s petition; so we may accept Mr. *1143 Keresey’s enumeration of some of the consequences which Mr. Keresey claims to have resulted from these proceedings:
1. Loss of law practice.
2. Loss of law office; termination of business license.
3. $105,000.00 spent out-of-pocket.
4. $75,000.00 in credit card advances and other personal debt.
5. Forced to sell personal property and possessions, including furniture, art work, library.
6. Forced to move out of personal residence of nine years.
7. Now living as a homeless person in his truck with his dog.
8. Respondent has been forced to try to find work as a laborer, since his good reputation as a lawyer has been destroyed by false Bar complaints; cannot obtain new position as a lawyer in a firm because Bar matter is still unresolved and a serious “blight” on Respondent’s resume.
9. Respondent is presently unemployed, has no income, is legally bankrupt as his debts exceed his assets, and has no means to pay further costs of his defense after three years of defending Bar’s false complaint.

It taxes the imagination to try to think of what this “reprimand” letter might have said.

Bar counsel at the August 3, 1995 hearing, similarly to previous Bar counsel at the March 1994 hearing, advised the Board on the subject of “sexual relations” as follows:
This is basically an ongoing controversy in Nevada right now, Mr. Humphrey. We do not have a specific rule that is what we would call a per se rule prohibiting a lawyer from having sexual relations with a client. . . .
Some states have a rule, its a per se rule, no sexual intercourse with clients in ongoing litigation — we do not have that rule. . . .
We have . . . over the last two years since I’ve been with the State Bar three or four complaints ... of sexual relationships with lawyer-type complaints .... I’m not aware of a case that has been vehemently prosecuted based on that alone, based upon an attorney having sex with a client alone.
A Board member commented at the August 3, 1995 hearing:
If we don’t have a black and white rule on it. I don’t see, you know, in the absence of real strong compelling circumstances, how you can hang a lawyer out on it.
Given these comments it is hard to understand why the Board voted to “go forward” on this issue.